UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| DERRICK W. WHITE, an individual,<br><br>             Plaintiff,<br><br>v.<br><br>OXARC, INC., a Washington<br>Corporation,<br><br>             Defendant. | Case No. 1:19-cv-00485-CWD<br><br>**MEMORANDUM DECISION AND ORDER**<br><br>**RE: Dkt. 113, 114** |

## INTRODUCTION

Plaintiff Derrick W. White filed this action against Defendant Oxarc, Inc., alleging deprivation of rights secured by the Family Medical Leave Act, ("FMLA"), 28 U.S.C. § 2615, the Americans with Disabilities Act, as amended in 2008 ("ADA-AA"), 42 U.S.C. § 12112(a), and the Idaho Human Rights Act ("IHRA"), Idaho Code § 67-5909, et seq. The Complaint asserted three causes of action against Oxarc: (1) FMLA interference; (2) FMLA retaliation; and (3) disability discrimination. A jury trial was held in this matter and, after deliberation, the jury returned a verdict on April 22, 2022, in favor of White on all three of his claims.

Pending before the Court is White's Motion for Liquidated Damages, Interest, and Adjustment, and Oxarc's Renewed Motion for Judgment as a Matter of Law or, Alternatively, New Trial. (Dkt. 113, 114.) The parties have fully briefed the motions and they are now ripe for the Court's consideration. Having reviewed the record herein, the Court finds the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motions will be decided on the record before the Court. Dist. Idaho Loc. Civ. R. 7.1.

## FACTUAL AND PROCEDURAL BACKGROUND

White's employment at Oxarc was terminated on July 28, 2017, after he had been approved for FMLA leave, and while he was suffering from a disability. White contends that Oxarc's termination decision was made in violation of the FMLA, and the ADA-AA and IHRA. White initiated this action on December 9, 2019, against Oxarc, and Oxarc later filed a motion for summary judgment. (Dkt. 1, 26.)

On July 6, 2021, the Court entered an order denying Oxarc's motion for summary judgment, finding material factual disputes precluded entry of judgment as a matter of law. (Dkt. 36.) The relevant facts for purposes of deciding the instant motions, and as reflected in the Court's order denying summary judgment, follow.

White was hired by Oxarc on December 26, 2000, as an Inside Sales and Back-Up Driver. On or about May 12, 2017, White sought medical attention for ongoing back and

leg pain.[1] On May 19, 2017, White was diagnosed with lumbar spondylosis, lumbar radiculopathy, and a herniated disc. He was thereafter scheduled for laminectomy surgery to occur on August 15, 2017.

On May 31, 2017, White requested FMLA leave. Oxarc granted the request. White took FMLA leave from May 31, 2017, to July 4, 2017. Upon his return to work on July 5, 2017, White was limited to light duty work,[2] and prohibited from lifting, pushing, or pulling more than fifteen pounds. White was also restricted from delivering and performing any other duties that required excessive lifting. White's healthcare provider noted that White may need to take additional leave for flare-ups of his back and leg pain.

Accordingly, Cammie Hill, Oxarc's Human Resources manager, approved White for intermittent FMLA leave. White's supervisor, Mike McGuire, was made aware that White had been approved for intermittent FMLA leave and that White was restricted to light duty work.

On Friday, July 21, 2017, White was training another employee, Ian Jensen, on the delivery route. While on the delivery route, White received a phone call informing him that his upcoming laminectomy surgery would not be covered by insurance. White was also experiencing severe leg pain. White asked Jensen to take him back to the Oxarc store. While on the way, White called to speak with McGuire to obtain approval to leave early that day. McGuire was out at the time White called, so White spoke instead to

---

[1] White's injury was not job related.
[2] White testified he had to return to work because he realized he would need additional FMLA leave following his surgery.

**MEMORANDUM DECISION AND ORDER - 3**

another employee, asking that the information about him leaving early be relayed to McGuire.  White also attempted to speak with Hill, and he left her a voice message requesting a call back.

White left one hour early on that Friday. On Monday, July 24, 2017, Hill drafted a warning letter for McGuire to present to White as discipline for leaving work early the preceding Friday without preapproval from McGuire. On July 25, 2017, McGuire met with White and gave him the warning letter.

On July 28, 2017, McGuire spoke with White regarding two invoices in which White had made errors. Later that same day, White returned to his desk, and put his leg up to relieve his pain. McGuire confronted White, asking him if he needed something to do. White informed McGuire that his leg hurt, and he needed a moment to gather himself. McGuire recalls White telling him to "get off my back." Ultimately, McGuire told White to go home.

Following White's departure, McGuire spoke with Hill. She instructed McGuire to compose an incident report of what had transpired earlier that day. McGuire did so. McGuire also found White's timesheet on his desk for the preceding two week pay period and forwarded this information to the Oxarc Executive Team. The Executive Team noted that White had recorded eight hours of work on July 21, 2017, the day he left one hour early.

Thereafter, Jana Nelson, Michael Sutley, and Jason Kirby, who comprised Oxarc's Executive Team,  participated in a conference call with Cammie Hill, and decided to terminate White's employment. The termination letter identified three reasons for

**MEMORANDUM DECISION AND ORDER  - 4**

termination: performance (mistakes on invoices), insubordination or other disrespectful conduct, and falsification of timekeeping records.

Trial began on April 18, 2022. Neither party lodged any formal objections to the Court's jury instructions. (Dkt. 100.) On April 22, 2022, the jury returned a Special Verdict in favor of White. The jury found that White incurred back pay damages because of Oxarc's violation of the FMLA, ADA-AA, and IHRA, awarding $51,711.35.[3] The jury also found White incurred non-economic damages because of Oxarc's violation of the ADA-AA and IHRA, awarding $877,500.00. (Dkt. 102.)

Post trial, the parties stipulated to a schedule for filing motions before the Court entered judgment on the verdict. On June 2, 2022, the parties filed their respective motions. Having reviewed the motions and supporting materials, the trial transcripts, and the entire record, the Court finds as follows.

## ANALYSIS

### 1. Oxarc's Renewed Motion for Judgment as a Matter of Law or, Alternatively, New Trial

At the close of the evidence,[4] Oxarc made a Rule 50(a) motion. The Court denied the motion and the case was submitted to the jury, resulting in the verdict in White's favor. Oxarc now renews its motion for a judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), and requests the Court vacate the jury's award. Oxarc alternatively contends that the Court should grant a new trial on the grounds that the jury's verdict and

---

[3] The jury's verdict awarding back pay under the ADA-AA was advisory.
[4] The Court allowed the motion to be presented at the close of the evidence so as not to disrupt the presentation of testimony.

damage awards are based on error and not supported by the evidence, and also that the damages awarded are speculative and excessive.

A. **Legal Standards**

(1) **Rule 50**

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law. Under Rule 50(a), a party must first move for judgment as a matter of law before the case is submitted to the jury and "specify…the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). Under Rule 50(b), if the Court denies the pre-verdict motion, "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). "A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." Fed. R. Civ. P. 50(b), advisory committee's note to 1991 amendment.

The Court may grant a Rule 50 motion for judgment as a matter of law only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. County of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (internal citations omitted). "A jury's verdict must be upheld if it is supported by substantial evidence…even if it is also possible to draw a contrary conclusion from the same evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). "The test is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co*., 312 F.3d 998, 1010 (9th Cir. 2002); *see*

**MEMORANDUM DECISION AND ORDER - 6**

*also E.E.O.C. v. Go Daddy Software, Inc*., 581 F.3d 951, 961 (9th Cir. 2009) ("The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.").

"[I]n entertaining a motion for judgment as a matter of law, the court ... may not make credibility determinations or weigh the evidence." *Go Daddy Software, Inc*., 581 at 961 (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000)). Rather, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id*.

## (2)    *Rule 59*

Rule 59(a) governs a request for a new trial. The rule provides that, "[n]o later than 28 days after the entry of judgment, the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion." Fed. R. Civ. P. 59(d). The Court has not only the right but "indeed the duty…to weigh the evidence as he [or she] saw it…and to set aside the verdict of the jury, even though supported by substantial evidence, where, in his [or her] conscientious opinion, the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Moist Cold Refrigerator Co. v. Lou Johnson Co*., 249 F.2d 246, 256 (9th Cir. 1957).

"Although a court need not consider the evidence in a manner that favors the prevailing party and it may grant a new trial even if there is some evidence in support of the prior decision, it should not grant a new trial unless it more than simply disagree[s] with the verdict." *Gates v. Boyle*, No. CV 05-59-M-DWM, 2007 WL 9710298, at *1 (D.

**MEMORANDUM DECISION AND ORDER  - 7**

Mont. Mar. 15, 2007) (Molloy, J.) (internal quotation omitted). "[A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987) (citation omitted). "Nonetheless, a new trial is appropriate where the court has a firm conviction of the jury's error and an attendant miscarriage of justice." *Gates*, 2007 WL 9710298, at *1 (internal quotations omitted).

Unlike a Rule 50 motion, under Rule 59 the Court may assess the credibility of the witnesses. *See Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (per curiam). A new trial may also be granted if the Court concludes that a party was prejudiced by erroneous evidentiary decisions or by some other unfairness in the trial. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999).

Finally, the Court has "considerable discretion" when addressing motions to amend a judgment under Rule 59(e). *Turner v. Burlington Northern Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003). However, "a Rule 59(e) motion is an 'extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources.'" *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) (citing *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)). Typically, the Court may grant a Rule 59(e) motion where it "is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Id*. (citing *McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999) (en banc) (quoting *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999))).

MEMORANDUM DECISION AND ORDER - 8

The Court notes that the basis for Oxarc's Rule 59 motion is unclear. Oxarc references Rule 59(e) at the conclusion of its memorandum, but sets forth the specific standard for ordering a new trial under Rule 59(a). Furthermore, it appears that Oxarc's reference to Rule 59 is merely included as an alternative basis to vacate the jury's verdict – Oxarc makes no specific arguments under Rule 59, except perhaps with respect to its contention that the jury's award of non-economic damages is excessive. Rather, Oxarc simply contends that, if the Court declines to enter relief pursuant to Rule 50(b), the Court should grant a new trial instead. Def.'s Mem. at 18. (Dkt. 114-1.)

None of the grounds for granting a new trial are present in this case. In fact, Oxarc makes no real attempt to assert them. Instead, Oxarc focuses its arguments almost exclusively on matters more appropriately addressed under Rule 50(b). Accordingly, Oxarc's motion asserting alternative relief under Rules 59(a) and (e) in the event the Court declines to grant relief under Rule 50(b) will be denied. The Court will consider Oxarc's arguments as they apply to its Rule 50(b) motion for judgment as a matter of law.

### B.   Analysis – FMLA and Disability Discrimination

Oxarc moves for judgment as a matter of law with respect to White's FMLA claims on three grounds.[5] First, Oxarc argues that no evidence was submitted to establish that Oxarc denied White any FMLA benefit to which he was entitled. Second, Oxarc

---

[5] Oxarc discusses the issues related to the FMLA claims beginning with its argument that its conduct was not willful. The Court addresses them in a different order, beginning with Oxarc's argument that White did not present sufficient evidence of his prima facie case under the FMLA.

asserts no evidence was admitted establishing White opposed an unlawful employment practice under the FMLA, or that he was subjected to an adverse action because of opposition to that employment practice. And third, Oxarc maintains White did not present sufficient evidence of willfulness.

Turning to White's claims under the ADA-AA and IHRA, Oxarc argues White did not present sufficient evidence that his employment was terminated because of a disability.

For similar reasons expressed by the Court when denying Oxarc's motion at the close of evidence during trial, Oxarc's renewed Rule 50 motion will be denied as explained below.

### (1)   *FMLA Interference Claim*

On his claim of wrongful interference in violation of the FMLA, White had the burden of proving each of the following by a preponderance of the evidence:

> 1. The plaintiff was an eligible employee for the FMLA protections;
> 2. The defendant was covered by the FMLA;
> 3. The plaintiff was entitled to leave under the FMLA;
> 4. The plaintiff provided sufficient notice of his intent to take leave;
> 5. Either:
>     a. The Defendant denied the plaintiff FMLA benefits to which he was entitled; or
>     b. The defendant used the plaintiff's taking of FMLA-protected leave as a negative factor in employment actions, such as hiring, promotions, disciplinary actions or termination; and,
> 6. The defendant's conduct was willful.

**MEMORANDUM DECISION AND ORDER  - 10**

(Dkt. 100, Jury Instr. No. 17.) The Court instructed the jury that Oxarc did not dispute

elements one, two, or three.

The jury was further instructed that:

> When an employee seeks leave due to a qualifying reason, for
> which the employer has previously provided the employee
> FMLA-protected leave, the employee must specifically
> reference either the qualifying reason for leave or the need for
> FMLA leave. An employee giving notice of the need for
> FMLA leave does not need to expressly assert rights under
> the FMLA or even mention the FMLA to meet his or her
> obligation to provide notice. When the need for leave is
> not foreseeable, an employee must comply with the
> employer's usual and customary notification rules for
> requesting leave, absent unusual circumstances.

(Dkt. 100, Jury Instr. No. 18.)

In the Ninth Circuit, the *McDonnell Douglas* framework does not apply to an

interference claim. *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011). The

right to FMLA leave includes the right to absences on an intermittent basis, if eligible. 29

U.S.C. § 2612(b)(1); 29 C.F.R. § 825.203. The employer's intent is irrelevant to a

determination of liability in an interference claim – rather, a violation of the FMLA

simply requires that the employer deny the employee's entitlement to FMLA leave.

*Sanders*, 657 F.3d at 778; *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1135 (9th Cir. 2003).

Further, the burden of proof rests upon the employer, not the employee, to show that it

had a legitimate reason to dismiss the employee regardless of the employee's request for,

or taking of, FMLA leave. *Sanders*, 657 F.3d at 780 (quoting *Smith v. Diffee Ford–*

*Lincoln–Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002)). "To ultimately prevail on an

FMLA interference claim, a plaintiff 'need only prove by a preponderance of the

evidence that [his] taking of FMLA-protected leave constituted a negative factor' in the employment decision. The plaintiff 'can prove this claim…by using either direct or circumstantial evidence, or both.'" *Andreatta v. Eldorado Resorts Corp.*, 214 F.Supp.3d 943, 953 (D. Nev. 2016) (quoting *Bachelder v. Am. West Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001)).

Oxarc contends the jury's verdict is not supported by the evidence at trial, because there was no evidence Oxarc denied White any FMLA benefit to which he was entitled. Def.'s Mem. at 13. (Dkt. 114-1.) Oxarc explains that: (1) White failed to provide sufficient information for McGuire to have determined whether the one hour absence at the end of the day on July 21, 2017, was protected FMLA leave; and (2) the warning letter White was given on July 25, 2017, did not render him unable to exercise his FMLA rights. White counters that the evidence was sufficient to support the jury's findings.

On summary judgment, the Court found there were material factual disputes concerning whether Oxarc discouraged White from using his intermittent FMLA leave by disciplining him for leaving early on July 21, and whether that factored into the decision to terminate his employment. Further, the Court explained that, if White's early departure on July 21 was FMLA leave, Oxarc's termination of his employment one week later constitutes a denial of his right to not have FMLA leave held against him. The Court explained that would suffice to render White unable to exercise his FMLA rights.

The Court finds it was entirely plausible for the jury to infer that Oxarc's conduct amounted to interference with White's federally protected rights pursuant to the FMLA. Upon his return to work on July 5, 2017, White was approved for intermittent,

unscheduled FMLA leave for flare-ups of his pain while awaiting surgery. Both Hill and McGuire knew of White's approval for intermittent FMLA leave. Tr. 269:16 – 270:7.

The jury heard testimony that, on July 21, 2017, White was in severe pain such that it was difficult for him to walk. Tr. Trans. 35 – 36; 38. Toward the end of his shift, White was notified his scheduled back surgery was not approved for insurance coverage, and he left one hour early to go to his physician's office seeking an explanation. Tr. Trans. 37. He had his co-worker, Ian Jensen, drive him as close to his vehicle as possible so he could hop to his car. Tr. Trans. 38-39. White also testified that, if he had not been experiencing pain on July 21, 2017, he would not have had any reason to leave work early. Tr. Trans. 59:1-3. There was testimony and evidence that White notified a co-worker, Greg Gonzalez, of his early departure, and expected that the information would be relayed to McGuire. White attempted also to inform Hill by leaving a voice mail message for her to return his call. Joint Ex. 141.

Oxarc insists McGuire's conversation with White on Monday, July 24, 2017, constitutes the company's attempt to ascertain whether White's one-hour absence on July 21 was potentially FMLA qualifying. But the jury heard testimony supporting an inference that this conversation was confrontational rather than a compassionate attempt by McGuire to discern the reason for White's early departure. White testified that on Monday, July 24, 2017, McGuire never inquired regarding White's need for leave the preceding Friday, and instead told him, "You don't just get to leave. You don't just get to come and leave as you please." Tr. Trans. 47. When White explained to McGuire what the circumstances were, "he told me he didn't care; that Mr. Gonzalez was not my

boss…And he expressed to me some other things he didn't…like. Like, he…had a problem with me communicating directly with Ms. Hill." Tr. Trans. 47.

White testified neither Hill nor McGuire ever asked him whether the one hour he left early was for FMLA leave, and that he believed McGuire was "not sensitive of the situation." Tr. Trans. 58:14-25; Joint Ex. 141. To that end, the jury heard testimony that McGuire did not believe White was experiencing pain. Tr. Trans. 38:16 -39:1. Despite Oxarc's contention that it determined the leave was not FMLA qualifying, Oxarc presented no evidence that any formal determination was made in that regard, and White was disciplined instead via the written warning letter. White's employment was later terminated based, in part, on leaving one hour early on July 21. Joint Ex. 145.

This evidence, when viewed in the light most favorable to White, supports the jury's verdict that Oxarc denied White a substantive right under the FMLA, and terminated his employment for a reason connected with his FMLA leave. *See Xin Liu*, 347 F.3d at 1135 (a failure to assess whether an employee is entitled to FMLA leave constitutes denial of a substantive right under FMLA); *Smith v. Diffee Ford-Lincoln-Mercury, Inc*., 298 F.3d 955, 961 (10th Cir. 2002) (A plaintiff can prevail under an interference/entitlement theory if he was denied his substantive rights under the FMLA for a reason connected with his FMLA leave.).

### (2) *FMLA Retaliation Claim*

On his claim of retaliation in violation of the FMLA, White had the burden of proving each of the following by a preponderance of the evidence:

1. he participated in FMLA-protected activity;

**MEMORANDUM DECISION AND ORDER - 14**

2. the defendant subjected the plaintiff to an adverse
employment action;
3. the plaintiff was subjected to an adverse employment
action because he participated in FMLA-protected activity;
and
4. the defendant's conduct was willful.

(Dkt. 100, Jury Instr. No. 19.) *See also* 29 U.S.C. § 2615(a)(2); *Porter v. Cal. Dep't. of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005).

A retaliation claim requires application of the *McDonnell Douglas* burden shifting framework. *Sanders*, 657 F.3d at 777; *see also Shepard v. City of Portland*, 829 F.Supp.2d 940, 953–54 (D. Or. 2011) (explaining that in the Ninth Circuit, *McDonnell Douglas* applies to a retaliation claim under 2615(a)(2)). Thus, once a plaintiff establishes a prima facie case of discrimination or retaliation, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for the adverse employment action." *Sanders*, 657 F.3d at 777 n.3. If the employer articulates a legitimate reason for its action, the plaintiff must then establish the reason is pretextual, either by showing the employer's proffered explanation is not credible, or by showing that unlawful discrimination more likely than not motivated the employer. *Id.*

Oxarc argues White failed to present sufficient evidence for the jury to find White was subjected to an adverse employment action "because of any opposition to an unlawful employment practice," and thus he cannot make out a prima facie case of retaliation under the FMLA. Tr. Trans. 373-374. Def.'s Mem at 14. (Dkt. 114-1.) White contends Oxarc's statement of the law is in error, on the grounds that an FMLA retaliation claim is not limited to a plaintiff's opposition to unlawful conduct. Rather,

White contends his claim arises because he engaged in protected activity – using FMLA leave time for which he was eligible.

White is correct. The Court set forth the elements of a prima facie case of retaliation under the FMLA in its order on summary judgment. (Dkt. 36.) Consistent with its order, the Court instructed the jury that a retaliation claim may be established if the plaintiff proved, by a preponderance of the evidence, that he participated in FMLA-protected activity and he was subjected to an adverse employment action because of such participation. (Dkt. 100, Jury Instr. No. 19.) Oxarc raised no objection to the Court's jury instruction regarding retaliation under the FMLA.

The Court finds there was sufficient evidence from which the jury could conclude that White engaged in protected activity under the FMLA. First, he asked for, and was granted, FMLA leave for the six week period prior to July 5, 2017, and on an intermittent basis upon his return to work while awaiting back surgery. Second, as discussed above, there was evidence that neither Hill nor McGuire asked White on July 24, 2017, about his leg pain, which was one of the reasons White testified he left early on July 21, 2017. Both McGuire and Hill knew White was awaiting back surgery and was approved for intermittent FMLA leave for pain flare-ups. Thus, the jury could reasonably have inferred that the one hour of leave was protected FMLA leave. Third, the jury could reasonably have inferred that White was engaged in protected activity on July 28, 2017, when he was taking an unscheduled break from his work duties to relieve his leg pain. There was also evidence that Hill knew White would likely need additional FMLA leave to recover after back surgery. Tr. Trans. 235:1-20; 259:10-261:6.

Despite Hill's and McGuire's knowledge of White's approved intermittent FMLA leave, the jury heard testimony that Hill did not disclose any information concerning White's prior FMLA leave, approved intermittent FMLA leave, or the potential need for future FMLA leave, to the Executive Team during a July 28, 2017, telephone conference when the decision was made to terminate White's employment. The jury could reasonably have construed Hill's failure to disclose White's approved FMLA leave to the Executive Team as retaliatory, because his absence on July 21 and his break on July 28 may have been construed by the jury as protected FMLA leave. Finally, the termination decision was based, in part, upon the one hour White left early the preceding Friday, as well as for "insubordination" on July 28, 2017, because White was taking an unscheduled break to relieve his leg pain.

The proximity in time between being granted FMLA leave, including intermittent FMLA leave, and the termination of White's employment, provides supporting evidence of a connection between the two events. *Xin Liu*, 347 F.3d at 1137 (citing *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir 1998) (holding that the "close temporal proximity between two events may give rise to an inference of causal connection.")). *See also DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1160 (10th Cir. 2009) ("Whenever termination occurs while the employee is on leave, that timing has significant probative force."); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("[I]n some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."). From

all of this evidence, the Court finds the jury could reasonably conclude that Oxarc retaliated against White in violation of the FMLA.

Oxarc did not raise any arguments concerning the remaining elements of White's FMLA retaliation claim in its renewed Rule 50 motion. Consequently, the Court will not discuss the evidence presented regarding pretext.[6]

### (3) *Willfulness*

The element of willfulness is not ordinarily a part of the plaintiff's prima facie case under the FMLA. Here, however, the last employment action in question occurred on July 28, 2017. White did not file the Complaint until December 9, 2019, approximately five months after the expiration of the two-year limitations period applicable under 29 U.S.C. § 2617(c)(1). Accordingly, White could assert a violation of the FMLA only if he also proved Oxarc's conduct was willful. 29 U.S.C. § 2617(c)(2) ("In the case of such action brought for a willful violation of section 2615 of this title, such action may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought."). *See, e.g., Alvarez v. IBP, Inc*., 339 F.3d 894, 908 (9th Cir. 2003) (applying analogous statute of limitation in the Fair Labor Standards Act, "FLSA"); Order (Dkt. 36.)

Thus, willfulness was included as an element of the plaintiff's prima facie case on both of White's FMLA claims. The jury was instructed that, to establish that Oxarc's conduct was willful, White "must prove by a preponderance of the evidence that the

---

[6] Oxarc confined its discussion of pretext to White's ADA-AA/IHRA claim. Def.'s Mem. at 14. (Dkt. 114-1.) Def.'s Reply at 2 – 3. (Dkt. 117.)

**MEMORANDUM DECISION AND ORDER  - 18**

defendant knew or showed reckless disregard for whether its conduct violated the FMLA." (Dkt. 100, Jury Instr. No. 22.) *See also* 29 U.S.C. § 2615(a)(1); *Olson v. Dep't of Energy*, 980 F.3d 1334, 1339 (9th Cir. 2020); *Sanders*, 657 F.3d at 777–78; *Bachelder*, 259 F.3d at 1124; *Ryan v. The Internet Truckstop LLC*, No. 1:20-CV-00321-CWD, 2021 WL 4847428, at *10 (D. Idaho Oct. 18, 2021).

The Court also instructed the jury that Oxarc, as a corporation, "can only act through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority." (Dkt. 100, Jury Instr. No. 15.)

Oxarc contends its conduct cannot substantiate a finding of willfulness, because the Executive Team had no knowledge that White had been on light duty, had recently taken FMLA leave, had a back problem, or had back or leg pain when the Executive Team unanimously decided to terminate White's employment on July 28, 2017. Def.'s Mem. at 11. (Dkt. 114-1.) Because the Executive Team had no knowledge, and its members as a whole—neither Hill nor McGuire—made the decision to terminate White's employment, Oxarc argues its conduct cannot, as a matter of law, be willful. But, the glaring flaw in Oxarc's argument is that Hill and McGuire had supervisory authority over the terms and conditions of White's employment, and their actions and knowledge were imputable to the Executive Team.

Under the FMLA, an employer includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A). Furthermore, an employer may be held vicariously liable for a

supervisor's actions. *Miller v. Lemhi Cnty.,* No. 4:15-CV-00156-EJL-CWD, 2017 WL 2590338, at *6 (D. Idaho June 13, 2017) (finding an employer vicariously liable for a supervisor's actions under "basic agency principles"); *Miller v. Winco Holdings, Inc.*, No. CV 04-476-S-MHW, 2006 WL 1471263, at *7 (D. Idaho May 22, 2006) (retaliation claim may be premised on a discriminatory act by a co-worker whose actions can be imputed to the employer through any agency theory); *Alejandro v. ST Micro Elecs., Inc.*, 129 F. Supp. 3d 898, 909 (N.D. Cal. 2015) ("A supervisor's knowledge of an employee's disability is imputed to the employer because '[a] supervisor is the employer's agent for purposes of vicarious liability for unlawful discrimination.'") (quoting *Cal. Fair Emp. & Hous. Com. v. Gemini Aluminum Corp.*, 122 Cal. App. 4th 1004, 1015, 18 Cal. Rptr. 3d 906, 913 (2004)).

For example, "if the supervisors who knew that [the employee] was disabled set the disciplinary process in motion, and they were motivated by animus, that is sufficient to impute the motive to the company." *Lambert v. Nat'l R.R. Passenger Corp.*, No. CV 13-08316 DDP MANX, 2015 WL 1967044, at *7 (C.D. Cal. Apr. 29, 2015) (citing *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) (in federal age discrimination case, holding "if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.")).

**MEMORANDUM DECISION AND ORDER - 20**

Consequently, Oxarc's argument that its conduct cannot be found willful because the Executive Team members were insulated from the knowledge Hill and McGuire had about White's medical leave status is wholly without merit. Indeed, Human Resource managers and others responsible for implementing the FMLA and other anti-discrimination laws have a responsibility to investigate and determine whether requested leave time is covered by the FMLA or other laws. Such individuals also have an obligation to inform the decisionmakers about the extent of any relevant knowledge before adverse employment action is taken. Accordingly, Hill's and McGuire's knowledge about White's protected leave status was imputed to the Executive Team. Moreover, Hill was one of the four decision-makers that unanimously decided to terminate White's employment. Tr. Trans. 326:11-18.[7] Thus, the jury could reasonably infer that the Executive Team knew White's FMLA rights may have been implicated, but they took adverse action anyway by terminating White's employment.

Turning to the evidence, the Court finds there was sufficient evidence admitted at trial to support the jury's finding that Oxarc's conduct was willful. The events of July 21, 2017, set in motion what could reasonably be interpreted by the jury as a concentrated effort to document reasons to support termination, without any meaningful inquiry on the part of Hill, McGuire, or the three members of the Executive Team to learn why a seventeen-year veteran member of the Oxarc "family" had suddenly demonstrated behavior egregious enough to support termination of employment.

---

[7] Jana Nelson, Michael Sutley, Jason Kirby, and Cammie Hill participated in the telephone call on July 28, 2017. *Id.*

**MEMORANDUM DECISION AND ORDER  - 21**

For instance, the jury heard testimony that Oxarc was self-insured, meaning Oxarc would likely cover the cost of White's back surgery. Hill became aware on July 21, 2017, that White needed surgery, which is the same day that precipitated the flurry of disciplinary actions leading to White's termination of employment one week later. Tr. Trans. 235:1-20; 259:10-261:6. There was evidence that Hill drafted the warning letter on July 24, 2017, for McGuire to give to White for leaving one hour early without speaking to either White or to Greg Gonzalez, even though she knew White had spoken to Gonzalez prior to leaving on July 21. Joint Ex. 139, 141, 142. If she had, she might have learned that one of the reasons White left early that day was due to his leg pain – the very condition for which Oxarc had approved intermittent FMLA leave. Tr. Trans. 38:4-12; Tr. Trans. 39:14-20.

The jury heard from White that the conversation he had with McGuire on July 25, 2017, was confrontational. And there was evidence that Hill wrote the warning letter McGuire presented to White before the meeting even took place. White testified that McGuire never asked him whether the reason White left early on July 21 was FMLA related, despite McGuire's knowledge of White's approved intermittent FMLA leave. Tr. Trans. 58:17-25; 165:2 – 7; Joint Exs. 139, 140. Nor did Hill inquire further as to the reason White left early despite her knowledge White would suffer intermittent flare ups of pain that may necessitate taking unscheduled, and approved, FMLA leave. Tr. Trans. 258:10-24; 242:2-23; Joint Exs. 133-139.

McGuire also acknowledged that, when he confronted White on July 28, 2017, because White was sitting at his desk with his leg up, White told him his leg hurt. Tr.

Trans. 174:3 – 175:2. But, there was evidence that McGuire never inquired further or otherwise asked if White needed FMLA leave time on account of his pain that day. Tr. Trans. 176:1 – 177:11. Thereafter, upon Hill's request, McGuire prepared a written summary of what occurred on July 28, 2017, and characterized White's conduct on July 28 as "insubordination." Tr. Trans. 177:11 – 24. Based upon this evidence, the jury reasonably could have, and did conclude, that White's early departure on July 21 and his unscheduled break on July 28 were related to his disabling condition and FMLA leave, and that White was therefore protected from adverse action as a result.

Additionally, the jury could have reasonably concluded that McGuire's and Hill's investigation was lacking as to the reasons for White's early departure on July 21, and his unscheduled break on July 28, before their concerns were presented to the Executive Team as reasons for termination of employment. The jury heard that, over the course of White's seventeen year career at Oxarc, McGuire could not recall writing White up for any similar behavior. Tr. Trans. 177:25 – 179:24. The two write ups for the events of July 21 and 28, and the decision to terminate White's employment, followed on the heels of White's return from protected FMLA leave on July 5, 2017, and approval of intermittent FMLA leave thereafter, for the pain White testified he was experiencing both of those days.

The jury also heard from two members of the Executive Team—Jason Kirby and Michael Sutley—about Oxarc's commitment to their employees. From their testimony, the jury reasonably could have concluded that the Executive Team members shirked their responsibility to discern the reasons why a long-time employee with a relatively benign

**MEMORANDUM DECISION AND ORDER - 23**

disciplinary history was suddenly displaying behavior sufficient to support termination of employment. For instance, Mike Sutley, who was a member of the Executive Team and participated in the July 28, 2017 phone call, testified that, "I always felt that when you are about to terminate an employee, you are really firing the whole family. You were terminating more than just the employee. So it was important that we understood what was going on and we are all on the same page as far as it was time to make that decision." Tr. Trans. 362:3-7.

Despite Sutley's sentiment, the information before the Executive Team was one sided—White was not asked to provide his version of events. Joint Ex. 141 – 146. The summary McGuire provided regarding the events of July 28, 2017, included information that White was attempting to "gather [him]self" because his "leg hurts." Joint Ex. 144. But, there was no evidence that any member of the Executive Team involved in the termination decision asked about White's leg, or why, after seventeen years, White suddenly was subject to multiple disciplinary actions and was being recommended for termination. Last, despite participating in the decision to terminate White's employment, Hill was silent concerning her knowledge about White's disabling condition and his approved intermittent FMLA leave.

The Court therefore finds the jury's verdict, which necessarily included a finding of willfulness, is supported by the evidence. Both Hill and McGuire set in motion the Executive Team's adverse employment decision. Hill and McGuire were aware of White's approved intermittent FMLA leave; they were aware he was experiencing pain; and they were aware he might experience flare ups of that pain necessitating FMLA

leave. Joint Ex. 134, 135, 137. Over the course of eight days, and in the absence of evidence of any recent disciplinary action for similar conduct, McGuire and Hill caused White to be written up multiple times, and then presented their summary of events to the Executive Team as grounds for termination of White's employment. Hill, along with three others, unanimously decided to terminate White's employment, without Hill uttering one word about the fact that she had approved intermittent FMLA leave for White's medical condition.

Accordingly, the Court finds there was more than sufficient evidence for the jury to find Oxarc knew or showed reckless disregard for whether its decision to terminate White's employment violated his FMLA rights. Thus, the two FMLA claims in White's complaint were not barred by the statute of limitations.

### (4)    *ADA-AA and IHRA Claim*

White brought his disability claims pursuant to the ADA-AA and the IHRA. The jury was instructed that White's claims under the ADA-AA and the IHRA have the same elements of proof,[8] and that White had the burden of proving each of the following elements by a preponderance of the evidence:

> 1.  the plaintiff has a physical impairment;
> 2.  the physical impairment substantially limited one or more major life activities;
> 3.  the plaintiff was a qualified individual; and
> 3.  the plaintiff was subject to an adverse employment action because of his physical impairment.

---

[8] Because the same standards apply to discrimination claims under both federal and Idaho law, the Court references only federal law in the ensuing discussion. *Harris v. Treasure Canyon Calcium Co.*, 132 F.Supp.3d 1228, 1236 n.2 (D. Idaho 2015) (citing *Bowles v. Keating*, 606 P.2d 458, 462 (Idaho 1979) (adopting the standards promulgated in federal discrimination cases for purposes of analyzing claims brought under the IHRA)).

**MEMORANDUM DECISION AND ORDER  - 25**

(Jury Instr. No. 23, Dkt. 100.) The Court instructed the jury that elements one, two and three were proved. *Id.*[9]

The jury was further instructed regarding White's burden of proof—that White must prove his disability was a "but-for cause of the adverse employment action by [Oxarc]. It need not be the only cause for the adverse employment action, so long as you find [White] would not have suffered the adverse employment action but for his disability." (Jury Instr. No. 24, Dkt. 100.)

The Court declines to upend the jury's finding that White suffered an adverse employment action because of his disabling condition—there was sufficient evidence for the jury to conclude that White's employment would not have been terminated but for his disability. The day White's employment was terminated, his pain required him to sit down and "gather himself." McGuire confronted White about taking this rest, implying White was taking an unauthorized break. In White's view, "but-for" his disability, there would have been no need to take a break, and no ensuing confrontation with McGuire, and thus Oxarc would not have terminated his employment on the grounds of "insubordination" for disobeying McGuire's directive. Joint Tr. Ex. 145. Tr. Trans. 180:22 – 181:18.

Oxarc tries again to insulate the Executive Team's decision to terminate White's employment on the grounds that McGuire did not participate in the July 28, 2017 phone conversation, and the Team had no knowledge of White's medical condition. But, as

---

[9] Oxarc admitted these elements had been proved.

**MEMORANDUM DECISION AND ORDER - 26**

discussed above, Hill participated in the call, and her knowledge, as well as McGuire's, about White's back injury and his potential need for an accommodation in the form of an unscheduled break was imputable to the Executive Team.

Oxarc claims also that White did not establish that its reasons for terminating White's employment were pretextual. The employer's articulation of facially nondiscriminatory reasons shifts the burden back to the plaintiff to show that the employer's reasons were a pretext for discrimination. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). A plaintiff can offer direct evidence of a discriminatory motive, such as statements by an employer which, if believed, proves the fact of discriminatory animus without inference or presumption. *Id.* at 1221 (citing *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994)). In cases where direct evidence is unavailable, "the plaintiff may come forward with circumstantial evidence that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Id.* at 1222.

The Court finds there was sufficient evidence for the jury to conclude the reasons proffered by Oxarc for terminating White's employment were pretextual. The termination letter stated that White's employment was terminated due to mistakes on invoices, and violation of company policies—specifically, insubordination or other disrespectful conduct; falsification of timekeeping records; and failing to inform McGuire that he was leaving early on July 21, 2017. Joint Tr. Ex. 145.

But, there was evidence presented that employees, including White, were routinely given the opportunity to correct invoice mistakes, and that McGuire would typically provide an opportunity to have invoices corrected rather than resort to discipline.

There was evidence that McGuire did not believe White was in pain, which in turn led to the confrontations with White on July 25 and 28. Hill testified she was not aware that White had ever been written up for disrespectful conduct prior to July 28. She also testified that she may have characterized White's request for rest on July 28 due to his pain as a request for a reasonable accommodation, yet she relied solely upon McGuire's summary as a reason to support the termination decision. There was also evidence that the three members of the Executive Team failed to consider the disability related limitations that White conveyed to McGuire as justification for taking a break from servicing customers on July 28.

Concerning White's timecard showing eight hours worked on July 21, there was evidence that McGuire previously had noted minor errors on White's timecard from time to time, and given White an opportunity to correct them. The jury also heard that White was sent home on July 28 prior to turning in his timecard for the preceding two weeks, so he could have corrected the mistake if given the opportunity. Next, there was evidence Hill did not know if White had arrived early on July 21, or had taken a lunch break, and that she unilaterally altered the timecard without confirming the hours worked. And last, there was evidence that White called the store and Hill to report his early departure on July 21.

**MEMORANDUM DECISION AND ORDER - 28**

The Court finds this evidence, as well as credibility determinations reserved for the jury, was sufficient to support the jury's finding that Oxarc's reasons for terminating White's employment were not worthy of credence.

## 2.      Damages

Both parties raised arguments in their respective motions concerning the jury's award of non-economic damages and back pay, and White's entitlement to liquidated damages. Oxarc argues that the non-economic damage award is grossly excessive and not supported by the evidence; the back pay award is subject to reduction; and liquidated damages are not recoverable under the FMLA. White argues to the contrary, both in response to Oxarc's motion and in his own motion. Accordingly, the parties' respective arguments will be considered together below.

### A.      Non-Economic Damages

The jury found that White incurred both back pay damages and non-economic damages because of Oxarc's violation of the ADA-AA and IHRA,[10] and awarded $877,500.00 in non-economic damages. (Dkt. 102.) Oxarc insists a reduction to the non-economic damages award is warranted, because it is grossly excessive and not supported by sufficient evidence. Oxarc alternatively contends that the entirety of the non-economic damages award must be allocated to White's ADA-AA claim, and is therefore subject to the statutory cap of $200,000.00 provided in 42 U.S.C. § 1981a(b)(3).[11]

---

[10] The FMLA does not provide for an award of non-economic damages. 29 U.S.C. § 2617(a). Accordingly, the special verdict form only asked about non-economic damages in relation to White's ADA-AA and IHRA claims.

[11] Oxarc has 300 employees. Tr. Trans. 277:11.

**MEMORANDUM DECISION AND ORDER  - 29**

White counters that the damage award is not excessive, and is supported by the testimony of White and Ms. Myers regarding the severe emotional impact of the termination of his employment. White further argues that the ADA-AA cap does not apply, because the jury awarded non-economic damages because of the defendant's violation of both the ADA-AA and the IHRA. The IHRA has no cap on non-economic compensatory damages.

The Court must determine if the jury's award of non-economic damages is "grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation and guesswork." *Los Angeles Mem'l Coliseum Comm'n v. Nt'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986). In determining whether damages are excessive, the Court "afford[s] great deference to a jury's award of damages and will uphold the award unless it is clearly not supported by the evidence or only based on speculation or guesswork." *Williams v. Gaye*, 895 F.3d 1106, 1128 (9th Cir. 2018) (internal quotation marks and citations omitted).

At trial, White presented sufficient evidence, both through his own testimony and from Ms. Myers,[12] concerning the emotional distress White suffered as a result of the termination from employment with Oxarc. White testified about the financial uncertainty that the termination caused. Tr. Trans. 78. He testified about his inability to continue his and his late wife's[13] legacy with Athletic Zone, which provided community services to

---

[12] White and Ms. Myers were not legally married, but referred to each other as husband and wife. Tr. Trans. 307:14-17.
[13] White was married previously, and his first wife passed away before the events of 2017 transpired.

**MEMORANDUM DECISION AND ORDER - 30**

underprivileged athletes. *Id.* at 78 – 80. The work schedule for his new job at Valley Ride prevented him from pursuing other athletic coaching opportunities that he otherwise would have pursued had he remained employed at Oxarc. *Id.* at 85. He missed his children's high school and college basketball games due to his new work schedule, and he testified how that affected him emotionally.[14] *Id.* at 86 – 93. White also testified about the impact the termination had on his relationship with Ms. Myers, and his ability to care for his special needs child. *Id.* at 94 – 95. Ms. Myers corroborated White's testimony. This evidence, when construed in the light most favorable to White, allowed the jury to find as it did when reaching its verdict.[15]

 Oxarc advances several arguments in support of its alternative claim that the ADA-AA's statutory cap on damages should apply. First, Oxarc insists the entire damage award must be allocated to White's claim under the ADA-AA, because the special verdict form did not ask the jury to apportion non-economic damages between the ADA-AA and the IHRA claims. The Court finds this argument without merit. The jury was instructed that the legal standard under the ADA-AA and IHRA is the same. Thus, a violation of one statute was a violation of the other—they are parallel claims with the same elements and burden of proof. This was reflected accurately on the special verdict form—the jury

---

[14] The jury clearly rejected Oxarc's argument that White's emotional distress was caused by his new work schedule. The jury could reasonably conclude that, but for the wrongful termination, White would not have had to seek a new job or work a schedule that did not allow him to attend athletic events in which his children were participating.

[15] Oxarc offers a comparison of this case to *Hilliard v. Twin Falls County Sheriff's Office*, noting that the jury there awarded only $300,000 in non-economic damages. Case No. 1:18-cv-00550-CWD. (Dkt. 142.) However, the facts of *Hilliard* are sufficiently distinct from the facts in the present case to offer relatively little guidance to the Court.

**MEMORANDUM DECISION AND ORDER - 31**

awarded non-economic damages "because of the defendant's violation of the ADA <u>and</u> IHRA." Hence, the jury did not apportion non-economic damages between the ADA-AA claim and the IHRA claim, because they did not need to do so. The claims were one and the same, and the damages flowed from the same series of events that culminated in the termination of White's employment. For these reasons, the Court finds Oxarc's apportionment argument without merit.[16]

Next, Oxarc claims that the Court has routinely applied the ADA-AA's statutory cap when a plaintiff asserts parallel claims under the IHRA and the ADA-AA. However, a close examination of the two cases Oxarc relies upon reveals they do not support Oxarc's assertion. In *Ward v. Sorrento Lactalis, Inc.*, No. 1:04-cv-00006-BLW-LMB, 2005 WL 4021366 at *4 (D. Idaho Dec. 22, 2005), the jury was instructed that Ward's claims were brought pursuant to the ADA-AA, the IHRA, Idaho's public policy, and the implied covenant of good faith and fair dealing. The jury awarded "non-economic damages…as a result of Sorrento's violation of the law" in the amount of $445,000.00. (No. 1:04-cv-00006-BLW-LMB, Dkt. 88.) In contrast to the special verdict form in this case, none of Ward's claims were stated by name on the verdict form. Further, the Court simply stated, post-trial, that it was "undisputed that this sum must be reduced to $300,000.00 to comply with the ADA's statutory cap set forth in 42 U.S.C. §

---

[16] Oxarc contends also that White waived his argument that the award should be allocated to his IHRA claim because he did not assert that argument in his own motion and opening brief. The Court has found no authority finding waiver under Oxarc's theory that White had to affirmatively raise the issue in his own motion, and not in response to Oxarc's motion.

**MEMORANDUM DECISION AND ORDER - 32**

1981a(b)(3)" without any analysis. *Ward*, 2005 WL 4021366, at *4. Accordingly, the Court does not find *Ward* persuasive here.

And while Oxarc is correct that the Court reduced the jury's $1,800,000.00 non-economic damage award in *Fuller v. Dep't of Corrections* No. 1:13-cv-00035-DCN, 2019 WL 2192116, at *1 (D. Idaho May 21, 2019), *Fuller* is inapposite. There, the jury awarded damages because of the defendant's violation of Title VII – no state law claims were presented to the jury and there was no overlap of the award. (Case No. 1:13-cv-00035-DCN, Dkt. 158.)

The Court also rejects Oxarc's final argument that the IHRA's remedy provision set forth in Idaho Code § 67-5908(c) must be construed consistently with the ADA-AA and requires the Court to reduce the non-economic damages award accordingly. Although the purpose of the IHRA stated in Idaho Code § 67-5901(1) is to allow the state to execute the policies embodied in the ADA-AA, nowhere does the state statute provide a cap on remedies consistent with the ADA-AA. In fact, the IHRA has a cap on an award of punitive damages, but not on any other element of damages. *See* Idaho Code § 67-5908. If the legislature intended to cap non-economic damages consistent with the ADA-AA, it would have said so. *C.f. Stout v. Key Training Corp.*, 158 P.3d 971, 974 (Idaho 2007) (finding that the IHRA did not expressly allow for an award of attorney fees, especially in light of the fact that federal civil rights laws allow for such recovery).[17]

---

[17] Oxarc asserts also that the limitation on non-economic damages set forth in Idaho Code § 6-1603 should apply. However, Section 1603 applies only to an action seeking damages for personal injury. The IHRA has its own remedy provision. Idaho Code § 67-5908.

**MEMORANDUM DECISION AND ORDER - 33**

Absent any authority that the Idaho legislature intended there to be a cap on non-economic damages under the IHRA consistent with the provisions of the ADA-AA, the Court will not imply one.[18]

In sum, the Court finds the jury's award of $877,500.00 for violation of the ADA-AA and the IHRA is supported by sufficient evidence at trial, and the award will not be reduced to the ADA-AA's statutory cap.

### B.    Back Pay

Both parties addressed the jury's award of $51,711.35 in back pay in their respective motions.[19] Further, the issue of back pay under the ADA-AA was submitted to the jury for an advisory verdict pursuant to Fed. R. Civ. P. 39(c)(1) (Dkt. 65.)[20]

White argues that, because the jury found in his favor on all three causes of action, the Court cannot conduct an equitable analysis of back pay under the ADA-AA without disturbing the jury's determination of compensatory back pay under the IHRA and the FMLA. White seeks no additional back pay beyond what the jury awarded, nor did he present evidence that allocated back pay damages among the three causes of action. In

---

[18] Further, it is entirely reasonable to infer that Idaho intended to provide for a greater recovery than under the ADA-AA.

[19] This is the amount Plaintiff's counsel suggested during closing argument.

[20] Back pay is an equitable damage awarded by the Court under the ADA-AA. 42 U.S.C. § 1981a and § 12117(a). However, under the IHRA, back pay is a legal remedy awarded by the jury. (Dkt. 65); *Smith v. Glenns Ferry Hwy. Dist.*, 462 P.3d 1147, 1157 (Idaho 2020). Thus, only the issue of back pay under the ADA-AA was submitted to the jury for an advisory verdict. Fed. R. Civ. P. 39(c)(1). The jury's award of back pay under the IHRA and the FMLA was not advisory, and represented damages arising out of the same conduct that supports an award of back pay under the ADA-AA.

other words, White sought compensatory back pay under three alternative theories of recovery, any of which would support the award of $51,711.35.[21]

### (1) *Findings of Fact*

Nonetheless, the Court will provide its analysis in conjunction with its finding that the jury's award was supported by sufficient evidence. Under the ADA-AA, a court has discretion to award such equitable relief as warranted, including back pay. *See* 42 U.S.C. § 1981a (incorporating the remedies of Title VII of the Civil Rights Act, which in turn, authorizes the court to "order such affirmative action as may be appropriate, which may include...reinstatement..., with or without back pay..., or any other equitable relief as the court deems appropriate."); 42 U.S.C. § 12117(a) (incorporating § 2000e-5(g)(1); *Lutz v. Glendale Union High School*, 403 F.3d 1061, 1069 (9th Cir. 2005) (holding that back pay under the ADA-AA is an equitable remedy to be determined by the court). Back pay damages are presumed and "are determined by measuring the difference between actual earnings for the period and those which [the plaintiff] would have earned absent the discrimination by [the] defendant." *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1158 (9th Cir. 1999); *see also Albarmarle Paper Co. v. Moody*, 442 U.S. 405, 421-22 (1975) (Employees who have proven employment discrimination are presumptively entitled to back pay.). Based upon the jury's verdict in White's favor, the supporting

---

[21] Because any one of the three alternative theories of recovery would support the award, Oxarc's argument that the award should be reduced because the jury did not allocate the back pay award among the FMLA claims and the ADA-AA and IHRA claims is not worthy of discussion.

**MEMORANDUM DECISION AND ORDER - 35**

evidence presented at trial, and as explained more fully below, the Court finds no reason to depart from the jury's award of back pay in the amount of $51,711.35.

In support of his claims, White presented evidence of back pay damages during trial. White relied upon his own testimony; the testimony of Cammie Hill, Oxarc's Human Resources manager, and Mike McGuire, Oxarc's store manager and White's supervisor; exhibits admitted during trial documenting White's hourly wage and other income during his employment with Oxarc; and, exhibits setting forth his mitigation earnings for the period after his termination from employment on July 28, 2017, up through the date of the verdict. Joint Trial Exs. 126, 130, 147 – 157.

White testified he was earning $18.60 per hour at the time his employment was terminated. Tr. Trans. at 69. Joint Trial Exs. 130, 148. White's regular work schedule was 40 hours per week, which schedule was reflected in his timecard for the period July 17, 2017 – July 28, 2017. Joint Exs. 137, 144, 148.

According to Oxarc's 2017 W-2 information, White received $22,604.20 from Oxarc in 2017 up through the date his employment was terminated. Joint Trial Ex. 148. At an hourly rate of $18.60, White would have received income of $38,688.00 for 2017, utilizing a standard multiplier of 2,080 hours per year.[22] Subtracting $22,604.20 from $38,688.00 yields $16,083.80.

Further, based upon the evidence admitted at trial, specifically McGuire's testimony and White's December 6, 2016, Performance Update, the Court finds by a

---

[22] *See* https://www.indeed.com/hire/hourly-to-salary-calculator-for-employers.

**MEMORANDUM DECISION AND ORDER  - 36**

preponderance of the evidence that White would have continued working from the date
he was terminated from employment until the date of the jury's verdict.

McGuire testified that he typically awarded a 3% raise each year to 95% of the
employees he supervised. Tr. Trans. at 194. The evidence established that White received
a raise of 3% on December 6, 2016, taking his hourly rate from $18.06 to $18.60. Joint
Trial Ex. 130. There was also evidence that White had received raises of 3% in 2007,
2010, 2012, 2013, 2014, and 2015. Joint Trial Exs. 111, 114, 115, 119, 121, 125. White
received a satisfactory Performance Update on December 6, 2016. Joint Trial Ex. 129.
Accordingly, contrary to Oxarc's assertion that any such finding is speculation, the Court
finds by a preponderance of the evidence that White would have received a 3% raise each
year had he continued to be employed at Oxarc.

Applying a 3% raise to White's hourly wage for work during each of the following
years, White's hourly rate would have increased to $19.16 in 2018; $19.73 in 2019;
$20.32 in 2020; $20.93 in 2021; and $21.56 in 2022.

Again using a standard multiplier of 2,080, and the hourly wage figures for the
years 2018 – 2022, White would have earned at least the following annual income had he
remained employed by Oxarc: $39,848.64 in 2018; $41,044.10 in 2019; $42,275.42 in
2020; $43,543.68 in 2021; and $13,800.00 in 2022 up through the date of the verdict.[23]

---

[23] Excluding weekends, there were 80 workdays between January 1, 2022, and April 22, 2022.
https://www.timeanddate.com/date/workdays.html?d1=1&m1=1&y1=2022&d2=22&m2=04&y2=2022&ti=on&

**MEMORANDUM DECISION AND ORDER - 37**

Combining the figure for the remaining period in 2017, and the annual wage amounts for 2018 – 2022,  yields a sum of $196,595.64.

White testified he was able to find employment following Oxarc's termination decision, and after he recovered from his back surgery. The Court finds that White proved, by a preponderance of the evidence, that he earned $3,725.44 from Mark W. Clemons, and $1,834.75 from Transit Management of Ada County, Inc. in 2017. White continued to work for Transit Management up through the date of the jury verdict. Based upon the evidence in the record, White earned $25,233.69 in 2018; $27,603.03 in 2019; $31,283.12 in 2020; $40,300.22 in 2021; and $13,257.56 in 2022, up through the pay period ending March 12, 2022. Joint Trial Exs. 151, 152, 153, 154, 155, 156, 157. His hourly wage reflected on his direct deposit advice dated March 18, 2022, was $26.01 per hour. Joint Trial Ex. 157. Six weeks elapsed between March 12, 2022, and the date of the jury's verdict. Utilizing White's hourly wage of $26.01, and multiplying by the number of workdays, yields $6,242.40 for the period between March 12, 2022, and April 22, 2022. Adding all of these figures yields a total amount earned by White between July 28, 2017, and April 22, 2022, of $149,480.21.

Subtracting $149,480.21 from $196,595.64 yields $47,115.43 in lost earnings from the date of termination to the date of the jury's verdict, a figure that is $4,595.92 less than the total the jury awarded as back pay damages. Neither party provided a specific explanation as to how the back pay figure of $51,711.35 suggested by White's

counsel was calculated.[24] The jury was instructed, however, that back pay may include "back wages, lost pay, and employee benefits the plaintiff would have received, if any, from the date the defendant took an adverse employment action against the plaintiff up to the date of your verdict." Jury Instr. No. 27.

There was evidence presented at trial that White earned income in addition to his weekly pay when employed by Oxarc. For instance, White's 2017 W-2 indicated White earned $700 in commission, $129.60 in "additional pay," and Oxarc matched $339.06 in 401(k) contributions. Joint Trial Ex. 148. The jury could reasonably inferred, therefore, that White earned an additional $1,168.66 in 2017, and would have continued to do so each year from 2018 - 2022.[25] For this six year period, the total sum would have been $7,011.96. This sum adequately accounts for the discrepancy between the Court's straight calculation of back pay and White's suggested figure, which the jury clearly adopted in light of the evidence admitted and available during its deliberations. *See Clear Wireless, LLC v. Mountain State Cellular, Inc*., No. 1:16-CV-000002-CWD, 2017 WL 10647030, at *14 (D. Idaho Aug. 8, 2017) (damages need only be proven with reasonable certainty, which requires "neither absolute assurance nor mathematical exactitude; rather, the

---

[24] White provided an itemized list of special damages on September 14, 2021, explaining the method used to calculate special damages. Rather than utilizing the accepted standard of 2080 hours as a multiplier, White calculated the number of workdays between the date White's employment was terminated on July 28, 2017, and the first day of trial, which was set to begin on September 28, 2021. (Dkt. 60.) The trial was vacated and reset, however, to commence on April 18, 2022. (Dkt. 71, 73.) White did not provide an amended list of special damages prior to the rescheduled trial date, although evidence of his lost earnings and mitigation earnings was provided through testimonial and documentary evidence during trial.

[25] This figure actually may fail to account fully for Oxarc's 401(k) match, which would have occurred with each paycheck. However, White did not present additional evidence regarding how much he received from Oxarc attributable to the company's 401(k) match. Thus, the only figure in the record is $339.06 reflected on White's final W-2 for 2017.

**MEMORANDUM DECISION AND ORDER - 39**

evidence need only be sufficient to remove the existence of damages from the realm of speculation," quoting *Griffith v. Clear Lakes Trout Co., Inc*., 152 P.3d 604, 611 (Idaho 2007)).

Accordingly, the Court finds the jury's back pay award of $51,711.35 is supported by a preponderance of the evidence in the record, and satisfies the ADA-AA's equitable purpose of back pay – to make the plaintiff whole. *Loeffler v. Frank*, 486 U.S. 549, 558 (1988) (An award of back pay is appropriate to advance "Congress' intent to make 'persons whole for injuries suffered through past discrimination.'") (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)). For these reasons, the Court agrees with and will adopt the jury's findings and advisory verdict as its own.[26]

### (2)    *Reductions Urged by Oxarc*

Oxarc argues the back pay award should be reduced by the $6,678.00 in unemployment benefits White received in 2017 and 2018. The United States Court of Appeals for the Ninth Circuit addressed this question in *Kauffman v. Sidereal Corp*., 695 F.2d 343, 347 (9th Cir. 1982). There, the defendant argued the plaintiff's back pay award under Title VII should be reduced by unemployment benefits received. The court declined to do so, on the ground that, if Congress did not intend for an employee to receive unemployment benefits in addition to back pay the "logical solution is a recoupment of the unemployment benefits by the state employment agency." *Id.* (citing *N.L.R.B. v. Gullett Gin Co*., 340 U.S. 361, 366, (1951)) The court also reasoned that,

---

[26] This also complies with Fed. R. Civ. P. 52 and serves as the Court's findings of fact and conclusions of law for matters tried with an advisory jury.

**MEMORANDUM DECISION AND ORDER  - 40**

because Title VII requires deduction of "amounts earnable with reasonable diligence, disallowance of an offset does not have the detrimental effect of discouraging discharged employees from seeking other work." *Id.* Accordingly, the court held that unemployment benefits received by a successful plaintiff in an employment discrimination action "are not offsets against a backpay award." *Id.* While Oxarc may have found contrary authority from other jurisdictions,[27] the Court finds no reason to depart from the Ninth Circuit's reasoning in *Kauffman.*

Accordingly, the final judgment entered by the Court will include $51,711.35 in back pay.

### C.    Liquidated Damages Under the FMLA

White contends he is entitled to liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii). Oxarc's argument to the contrary is twofold. First, Oxarc argues that liquidated damages should not be awarded, because there is no way for the Court or parties to know what portion of the back pay award represents damages attributable to an FMLA violation as opposed to disability discrimination. However, as discussed above, all of the adverse actions, including the termination decision, were found to be violative of

---

[27] Oxarc cited *Miles-Hickman v. David Powers Homes, Inc*., 613 F. Supp. 2d 872, 890 (S.D. Tex. 2009), where the court subtracted unemployment benefits the plaintiff received from the back pay award to prevent the plaintiff from recovering a windfall. Courts within the Ninth Circuit, however, follow the reasoning in *Kauffman* and *Gullett Gin*, and decline to deduct unemployment benefits from awards of back pay in employment discrimination cases. *See, e.g., Harris v. Lovitt & Touche Inc.*, No. CV-13-00013-TUC-FRZ, 2015 WL 13590162, at *2 (D. Ariz. Feb. 6, 2015); *McDonald v. Townsquare Media*, LLC, No. CV 12-203-M-DLC, 2014 WL 12600456, at *2 (D. Mont. Mar. 11, 2014); *Murrell-Travland v. On Q Fin., Inc.*, No. CV-11-01622-PHX-GMS, 2013 WL 3930133, at *3 (D. Ariz. July 30, 2013); *Melone v. Paul Evert's RV Country, Inc.*, No. 2:08-CV-00868-GWF, 2011 WL 6780877, at *9 (D. Nev. Dec. 27, 2011) *Arthur v. Gallagher Bassett Servs., Inc.*, No. CV 09-4882 SVW (CWX), 2010 WL 11596468, at *2 (C.D. Cal. June 1, 2010).

**MEMORANDUM DECISION AND ORDER - 41**

the FMLA and the anti-discrimination statutes. Further, because the same operative facts and evidence support the jury's verdict on all three claims, it would be virtually impossible to separate damages among them. Accordingly, Oxarc's first argument will not be addressed further.[28]

Second, Oxarc contends the good faith exception set forth in 29 U.S.C. § 2617(a)(1)(A)(iii) applies and therefore precludes an award of liquidated damages. This argument is without merit. Under the FMLA, a successful plaintiff is presumptively entitled to an award of liquidated damages equal to the amount of employment benefits denied or lost to him by reason of the defendant's FMLA violation, including interest calculated at the "prevailing rate." 29 U.S.C. § 2617(a)(1)(A). The statute also provides that, "if an employer who has violated [the FMLA] proves to the satisfaction of the [C]ourt that the act or omission [that violated the FMLA] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of [the FMLA]," the Court may, in its discretion, reduce the amount of liability to the jury's award of lost employment benefits plus interest. 29 U.S.C. § 2617(a)(1)(A)(iii).

---

[28] The Court finds *Jadwin v. Cnty. of Kern*, No. 07-CV-0026-OWW-DLB, 2010 WL 1267264, at *12 (E.D. Cal. Mar. 31, 2010), distinguishable. There, the court declined to award liquidated damages under the FMLA because the use of a general, undifferentiated verdict form made it impossible to determine whether the damages the jury awarded were based on an FMLA violation or some other non-FMLA violation. 2010 WL 1267264 at *13. In contrast here, a special verdict form was used, and the jury was asked specifically whether Oxarc's conduct violated the FMLA. Furthermore, unlike in *Jadwin*, there were not multiple discrete events occurring at different points in time supporting White's various claims of discrimination. Rather, White's damages flowed from the termination of his employment, which White alleged violated his rights under the FMLA and the anti-discrimination statutes.

**MEMORANDUM DECISION AND ORDER - 42**

Here, as discussed above in relation to the applicable statute of limitations, the jury's finding that Oxarc both interfered with and retaliated against White in violation of the FMLA necessarily included a finding that Oxarc's conduct was willful. Jury Instr. No. 17.  A finding of willfulness is inconsistent with a finding of good faith. *Chao v. A-One Med. Servs., Inc*., 346 F.3d 908, 920 (9th Cir. 2003). S*ee also Bothell v. Phase Metrics, Inc*., 299 F.3d 1120, 1130 (9th Cir. 2002) (noting the contrapositive, that a finding of good faith precludes a finding of willfulness); *Isom v. JDA Software Inc*., 225 F.Supp.3d 880, 887-88 (D. Ariz. 2016) (awarding liquidated damages upon finding willful violation of the FMLA); *Smith v. Micron Electronics, Inc*., No. CV–01–244–S–BLW, 2005 WL 5328543 *6 n.3 (D. Idaho Feb. 4, 2005) ("A finding of willfulness would preclude a finding of good faith…."). The jury's verdict therefore precludes a finding by the Court that Oxarc acted in good faith.[29]

Accordingly, White is entitled to liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii).

### 3.    Plaintiff's Motion for Interest and Adjustments

### A.    Prejudgment Interest

White asserts he is entitled to prejudgment interest on the back pay damages and liquidated damages awarded pursuant to the FMLA, and on the non-economic damages awarded pursuant to the ADA-AA and IHRA. Oxarc disputes that White is entitled to

---

[29] The statute contains two requirements – a finding of good faith, and a finding that the employer had reasonable grounds for believing its act was not a violation of the FMLA. The Court notes that Oxarc provides no argument to support a finding that Oxarc had reasonable grounds for believing the termination of White's employment was not a violation of the FMLA.

prejudgment interest under the FMLA, or that any award of prejudgment interest is allowed on non-economic damages.

The Court finds Oxarc's first argument—that White is not entitled to prejudgment interest on the back pay award because damages were not allocated among White's three claims—unpersuasive as discussed above. All of White's back pay damages flowed from the wrongful termination of White's employment, which the jury found was in violation of the FMLA, ADA-AA and IHRA.

Under the FMLA, an award of prejudgment interest is mandatory. *Eichenberger v. Falcon Air Express Inc.*, No. CV–14–00168–PHX–DGC, 2015 WL 3999142, at *8 (D. Ariz. July 1, 2015) ("an employer 'shall be liable' for the prejudgment interest on the amount of 'any wages, salary, employment benefits, or other compensation denied or lost to an employee by reason of the FMLA violation,'" quoting *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 301 (4th Cir. 2009)). Accordingly, an award of prejudgment interest is properly awarded on the back pay damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(ii).

Oxarc argues no additional prejudgment interest is allowed pursuant to 29 U.S.C. § 2617(a) on liquidated damages, because "it would already be included per the plain language of the FMLA." 29 U.S.C. § 2617(a)(1)(A)(iii) provides that liquidated damages are to be awarded "equal to the sum of the amount described in clause (i) and the interest described in clause (ii)…." The Court does not construe White's request for prejudgment interest on liquidated damages to be a double recovery, which is what Oxarc appears to suggest. Under the statute, White is entitled to liquidated damages equal to the wages or compensation lost by reason of the violation, plus interest on that amount. *See* 29 U.S.C.

**MEMORANDUM DECISION AND ORDER  - 44**

§ 2617(a)(1)(A)(i)(I), (ii) ("Liquidated damages are equal to the sum of the amount described in clause (i) and the interest in clause (ii)"); s*ee also Eichenberger*, 2015 WL 3999142 at *8 (holding any "award of liquidated damages under the FMLA must also include prejudgment interest," citing *Dotson*, 558 F.3d at 301). Accordingly, under the FMLA, White is entitled to back pay damages in the amount of $51,711.35 plus prejudgment interest, and liquidated damages equivalent to that same sum.

Next, White contends he is entitled to prejudgment interest on the non-economic damages award of $877,500.00 for violation of the ADA-AA and IHRA. Oxarc disputes that prejudgment interest is recoverable on this award for the following reasons: (1) White only moved for prejudgment interest under the FMLA, which does not allow for recovery of non-economic damages; (2) White provided no authority for recovery of prejudgment interest under the ADA-AA or IHRA; (3) prejudgment interest is allowable in Idaho only if damages are readily ascertainable by mathematical computation, which excludes damages for emotional distress; and, (4) even if entitled to prejudgment interest, it should run from the date of the verdict, not from the date of White's termination of employment.[30]

Oxarc is correct that non-economic damages are not recoverable under the FMLA. *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133 n.6  (9th Cir.2003) (citing 29 U.S.C. § 2617(a)). White discussed his argument in favor of an award of prejudgment interest on

---

[30] Oxarc also argued in response to White's motion that the non-economic damage award is entirely attributable to White's ADA-AA claim, and therefore subject to the statutory limit provided by 42 U.S.C. § 1981a(b)(3), which is $200,000.00. The Court resolved this argument, above, finding the cap does not apply when a parallel claim under the IHRA is asserted and is based upon the very same actions of the employer.

**MEMORANDUM DECISION AND ORDER  - 45**

non-economic damages in the section, "Plaintiff is Entitled To Prejudgment Interest Under the FMLA." However, it appears this was a scrivener's error, considering the jury awarded non-economic damages "because of the defendant's violation of the ADA and IHRA." (Dkt. 102.) White explains in his reply that he seeks prejudgment interest on the non-economic damages award under an equitable theory, without reference to either the ADA-AA or IHRA. Accordingly, the Court rejects Oxarc's first argument that White did not adequately explain the basis for an award of prejudgment interest.

Further, authority exists in the Ninth Circuit that non-economic damages are subject to an award of prejudgment interest. *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013). Prejudgment interest is an "element of compensation, not a penalty." *Id*. (citing *Schneider v. Cnty. of San Diego*, 285 F.3d 784, 789 (9th Cir. 2002)). Non-economic damages awarded for a plaintiff's pain and suffering are "just as much an 'actual loss' (for which prejudgment interest is in order)" as purely economic damages. *Id.* (citing *Murphy v. City of Elko*, 976 F.Supp. 1359, 1364 (D. Nev. 1997)). *See also Arnold v. Pfizer Inc.*, No. 10-CV-01025-AC, 2015 WL 1262775, at *4 (D. Or. Mar. 18, 2015) (determining the plaintiff was entitled to prejudgment interest on her emotional distress damages from the date of the verdict until a final, appealable judgment was entered).

Based upon the above authorities, the Court concludes White is entitled to prejudgment interest on the non-economic damages award. But, the Court finds no authority to support White's assertion that interest should run from either July 28, 2017, the date of termination, or February 13, 2018, the date Oxarc was formally on notice of

**MEMORANDUM DECISION AND ORDER - 46**

its alleged unlawful conduct under the FMLA, ADA-AA, and IHRA.[31] Rather, the Court

finds *Arnold* persuasive, and will award prejudgment interest from April 22, 2022, the

date of the jury's verdict, up through the date of entry of the final, appealable judgment.

White's non-economic damages did not become certain until the jury awarded them.

Turning to the rate of prejudgment interest, White asks the Court to apply a higher

interest rate than that applicable pursuant to 28 U.S.C. § 1961(a), which provides, in part,

that:

> [i]nterest shall be allowed on any money judgment in a civil
> case recovered in a district court…calculated from the date of
> the entry of the judgment, at a rate equal to the weekly
> average 1-year constant maturity Treasury yield…for the
> calendar week preceding the date of the judgment.

The Ninth Circuit has established that "the measure of interest rates prescribed for post-

judgment interest in 28 U.S.C. [§] 1961(a) is…appropriate for fixing the rate for

prejudgment interest in cases…where prejudgment interest may be awarded." *W. Pac.*

*Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1289 (9th Cir. 1984); *see also Van*

*Asdale v. Int'l Game Tech.*, 763 F.3d 1089, 1093 (9th Cir. 2014) (citation omitted). The

Ninth Circuit has also found that this interest rate is appropriate "with respect to

prejudgment interest in Title VII back pay cases." *Price v. Stevedoring Servs. of Am.,*

*Inc.*, 697 F.3d 820, 837 (9th Cir. 1984).

---

[31] White initially asserted he was entitled to prejudgment interest from July 28, 2017. However, in the reply brief, White proposed that prejudgment interest should run from the date he filed the Charge of Discrimination with the IHRC, which was February 13, 2018.

However, the FMLA provides that a plaintiff may recover interest on an award of back pay "at the prevailing rate." 29 U.S.C. § 2617(a)(1)(A)(ii). The statute does not define "prevailing rate," and courts have taken a variety of approaches to calculating prejudgment interest. *See, e.g., Bell v. Prefix, Inc.*, 500 F. App'x 473, 474 (6th Cir. 2012) (unpublished) (collecting cases and awarding prejudgment interest based upon the federal prime reserve rate); *Lusk v. Virginia Panel Corp.*, 2014 WL 3900325, at *5 (W.D. Va. Aug. 11, 2014) (noting that district courts "have variously utilized (1) the state statutory rate, (2) the IRS prime rate, and (3) the federal post-judgment interest rate set by 28 U.S.C. § 1961" to calculate prejudgment interest under the FMLA); *Smothers v. Solvay Chemicals, Inc.*, No. 11-CV-200-F, 2014 WL 12665068, at *4 (D. Wyo. Sept. 15, 2014) (setting prejudgment interest rate under the FMLA at the "current prime rate").

White asserts that the Court has discretion to award interest at the higher prime rate of 4.0%, which was effective as of June 1, 2022, and that it should exercise its discretion to do so because inflation has significantly reduced the value of the judgment proceeds. To the contrary, Oxarc contends the Court has no discretion to depart from the rate set by 28 U.S.C. § 1961(a).

On April 22, 2022, the date the jury rendered its verdict, the 1-year Treasury yield was 2.06%, and it is currently 4.64% as of December 13, 2022.[32] The historical prime

---

[32] https://ycharts.com/indicators/1_year_treasury_rate.

rate effective March 17, 2022, was 3.5%; effective May 5, 2022, it was 4.0%; and effective November 3, 2022, it is 7.0%.[33]

In the exercise of its discretion, the Court will award prejudgment interest on the back pay damages at the higher prime rate in effect at the time the jury rendered its verdict on April 22, 2022. The prime rate at that time was 3.5%. This rate adequately compensates White for the non-payment of wages due to him since the date of his termination on July 28, 2017, up through the date of the Court's entry of final, appealable judgment. The federal prime rate adequately satisfies the purposes of the FMLA and reflects a fair compromise between the 2.06% statutory rate and the effect of inflation without being punitive. *See Gutierrez v. Grant Cty.*, No. CV–10–48–LRS, 2011 WL 5279017, at *1 (E.D. Wash. Nov. 2, 2011) (finding that federal prime rate would satisfy the compensatory purposes of the FMLA). This approach appears also to accord with other decisions deciding the applicable prejudgment interest rate under the FMLA. *See, e.g., Smothers*, 2014 WL 12665068, at *4 (D. Wyo. Sept. 15, 2014) (finding the current prime rate would sufficiently meet the purposes of the FMLA without making the rate punitive and is a reasonable compromise between the parties' positions). Moreover, White provides no justification for utilizing the prime rate effective June 1, 2022.[34]

---

[33] https://www.jpmorganchase.com/about/our-business/historical-prime-rate. The prime rate has not increased since November 3, 2022. And, although neither party referenced the state court judgment rate, the Court includes it for completeness. The current rate for prejudgment interest in Idaho is 7.375%, while prior to July 1, 2022, it was 5.125%. Idaho Code § 28-22-104; https://sto.idaho.gov/Banking/Legal-Rate-of-Interest.

[34] The Court assumes White chose this date because he filed his motion on July 2, 2022. (Dkt. 113.)

**MEMORANDUM DECISION AND ORDER  - 49**

The Court will also award prejudgment interest on the non-economic damages award of $877,500.00 at the rate of 3.5% from April 22, 2022, up through the date of entry of a final appealable judgment. Such an award satisfies the "equitable principles favor[ing] calculating interest in a manner that more fully compensates the prevailing party." *Barnard v. Theobald*, 649 F. App'x 414, 416 (9th Cir. 2016). *See also Arnold*, 2015 WL 1262775, at *3 (awarding prejudgment interest on emotional distress damages from the date of the verdict until a final, appealable judgment is entered).

In sum, White is entitled to prejudgment interest on the back pay damage award of $51,711.35 at the rate of 3.5% from the date of his termination of employment on July 28, 2017, up through the date of the Court's entry of a final, appealable judgment, which will be the same as the date of this order.[35] White is also entitled to liquidated damages under the FMLA equivalent to that same sum. And finally, the Court will award prejudgment interest at the prime rate of 3.5% on the award of non-economic damages from the date of the jury's verdict on April 22, 2022, up through the date of the Court's entry of a final, appealable judgment.

## B.    Tax Consequence

For successful plaintiffs, back pay awards are taxable. *See Comm'r v. Schleier*, 515 U.S. 323, 327 (1995); *see also* 26 U.S.C. § 104(a)(2) (restricting income-tax exclusion for personal-injury awards to those "received ... on account of personal

---

[35] Oxarc did not object to the method of computation as set forth in White's memorandum. Accordingly, prejudgment interest will be calculated by utilizing a daily interest rate of 3.5%. This is equivalent to a daily interest rate of .009589%. Then, the daily interest rate is multiplied by the judgment amount to determine a daily amount of interest (.009589% x $51,711.35 = $4.96; and .009589% x $877,500.00 = $84.14).

physical injuries or physical sickness" (emphasis added)). The Ninth Circuit has recognized that tax "gross-ups," while not mandatory, may be appropriate in federal discrimination cases to secure "complete justice." *Clemens v. Centurylink Inc*., 874 F.3d 1113, 1116–17 (9th Cir. 2017). A lump-sum award will sometimes push a plaintiff into a higher tax bracket than he would have occupied had he received his pay incrementally over several years. *Clemens*, 874 F.3d at 1116. The party seeking relief bears the burden of "showing an income-tax disparity and justifying any adjustment" *Id.* at 1117. These decisions "are left to the sound discretion of the district court." *Id.*; *Coachman v. Seattle Auto Mgmt., Inc*., No. C17-187 RSM, 2019 WL 4695660, at *7 (W.D. Wash. Jan. 3, 2019), *aff'd*, 787 F. App'x 416 (9th Cir. 2019). *See also Schultz v. NW Permanente P.C.*, No. 3:20-CV-00626-IM, 2022 WL 2072602, at *7 (D. Or. June 9, 2022) (recognizing that, in the court's discretion, a tax gross up was permissible under the FMLA).

White claims that very side effect here. He argues that the taxman's expanded cut effectively denies him what the FMLA, the ADA, and the IHRA promise—full relief that puts White where he would be had the unlawful employment decisions and discrimination not occurred. White therefore seeks $3,634.36 to account for the additional federal and state income tax he will be required to pay on the back pay award, and $362,001.34 on the non-economic damages award.

Oxarc does not dispute White's calculation of his tax liabilities based upon White's current income and the effects of receipt of lump sum awards. Instead, Oxarc argues White is not entitled to any additional sums to compensate him for the tax liability he will face. Oxarc argues that a gross up is not warranted, given the "negligible" tax

liability White will face on the back pay award, and that a gross-up on the non-economic damages award would be punitive. But, the tax consequences are not negligible to White, as he argues in his reply memorandum.

In the exercise of its discretion, the Court will not grant a tax gross up on either award. First, White has not convinced the Court that his own calculations, which counsel set forth in the opening brief without expert opinion or support,[36] reflect the appropriate methodology. *See Lane v. Grant Cnty.*, No. CV-11-309-RHW, 2013 WL 5306986, at *10 (E.D. Wash. Sept. 20, 2013), *aff'd*, 610 F. App'x 698 (9th Cir. 2015) (declining to award gross-up without adequate methodology, and because it was not clear if the figure was "grossed down" to account for a possible reduction in Social Security taxes). Second, White has not supported the request with sufficient or applicable legal authority. Third, although the Court does not find the jury award excessive or unsupported, the Court is not convinced that the balance of equities requires Oxarc to shoulder the tax consequences of a substantial award of back pay damages and non-economic damages— taxes are imposed by the Internal Revenue Code, not by virtue of a defendant's wrongful conduct.

Accordingly, the final judgment will not include a sum to account for the anticipated tax consequences to White upon satisfaction of the judgment.

---

[36] Nor did White present expert testimony at trial.

**MEMORANDUM DECISION AND ORDER  - 52**

## CONCLUSION

In sum, Oxarc may disagree with White's assertions and the jury's interpretation of the evidence with respect to liability and damages under the FMLA, ADA-AA, and IHRA. However, while it may be "possible to draw a contrary conclusion" to that reached by the jury in this case, *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008), Oxarc has not carried its burden of showing the evidence presented at trial could result in "only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). The motion for judgment as a matter of law, or in the alternative for new trial, will be denied on all grounds argued by Oxarc with respect to liability and damages.

In accordance with the jury's verdict, final judgment will be entered in favor of White on his claims under the FLMA, and the ADA-AA and IHRA. Based on the verdict and the Court's findings of fact in regard to back pay under the ADA-AA, judgment in the amount of $51,711.35, plus prejudgment interest accruing at the rate of 3.5% from July 28, 2017, is appropriate. Under the FMLA, Plaintiff is entitled to liquidated damages equal to the sum of the back pay damages plus prejudgment interest.

The Court will award $877,500.00 in non-economic damages consistent with the jury's verdict. The Court concludes prejudgment interest at the rate of 3.5% is an appropriate prejudgment interest rate to be applied to the non-economic damages from April 22, 2022, up through the date of entry of a final, appealable judgment, which will be entered the same date as this order.

**MEMORANDUM DECISION AND ORDER - 53**

In the exercise of its discretion, the Court will not award a tax gross-up on either the back pay damages, liquidated damages, or non-economic damages.

### ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1.     Plaintiff's Motion for Liquidated Damages, Interest, and Adjustment (Dkt. 113) is **GRANTED IN PART AND DENIED IN PART.**

2.     Defendant's Renewed Motion for Judgment as a Matter of Law or, Alternatively, New Trial (Dkt. 114) is **DENIED**.

3.     The Court will enter a separate judgment consistent with this Order.

DATED: December 13, 2022

Honorable Candy W. Dale
United States Magistrate Judge